**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

SAMARON CORP. d/b/a TROYER,    )
PRODUCTS,                       )
                                )
Plaintiff,                      )
                                )
vs.                             )
                                )          No. 3:12-CV-397
UNITED OF OMAHA LIFE            )
INSURANCE COMPANY,              )
                                )
Defendant.                      )
_____ )
UNITED OF OMAHA LIFE            )
INSURANCE COMPANY,              )
                                )
Third-Party Plaintiff,          )
                                )
vs.                             )
                                )
DAVID A. BUCK,                  )
                                )
Third-Party Defendant.          )

**OPINION AND ORDER**

This matter is before the Court on: Troyer Products' Motion
for Partial Summary Judgment, filed on September 13, 2013 (DE
60); United of Omaha Life Insurance Company's Motion for Partial
Summary Judgment, filed on September 27, 2013 (DE 65); David A.
Buck's Motion for Summary Judgment, filed on September 27, 2013
(DE 63); and Plaintiff Troyer Products' Request for Oral
Argument on Summary Judgment Motions, filed on October 25, 2013
(DE 72). The Court finds that oral argument is not necessary,
and Troyer's request for oral argument (DE 72) is therefore

**DENIED.** For the reasons set forth below, Troyer Products' Motion for Partial Summary Judgment (DE 60) is **DENIED;** United of Omaha Life Insurance Company's Motion for Partial Summary Judgment (DE 65) is **DENIED** as to Count I (breach of contract) and **GRANTED** as to Counts II (negligent misrepresentation) and III (bad faith); and David A. Buck's Motion for Summary Judgment (DE 63) is **GRANTED.** The Clerk is directed to enter judgment in favor of Buck on Counts I and IV of the Third-Party Complaint. This case remains pending as to Count I of the Second Amended Complaint only (the breach of contract claim).

<u>BACKGROUND</u>

On July 23, 2012, Samaron Corp. d/b/a Troyer Products ("Troyer") filed a complaint against United of Omaha Life Insurance Company ("United"), alleging that United breached its contract when it failed to provide Troyer with life insurance proceeds from a $1,000,000 policy insuring the life of Ron Clark ("Clark"). United then filed a Third-Party Complaint against David Buck ("Buck"), the recipient of the death benefit, alleging that, if sums were paid to him improperly, Buck owes a duty of contribution and indemnity to United. United also alleged conversion and theft against Buck, and sought prejudgment garnishment of Buck's assets pending resolution of this suit. A motion for prejudgment writ of attachment was

filed but later withdrawn by the parties. It does not, however, appear that the count of the Third-Party Complaint asserting a right to prejudgment attachment was ever dismissed.

Troyer filed an amended complaint against United on November 9, 2012, alleging both breach of contract and negligent misrepresentation. The Second Amended Complaint was filed on August 14, 2013, again alleging breach of contract and negligent misrepresentation, but also alleging that United breached its duty of good faith and fair dealing. The parties stipulated to the dismissal of United's theft and conversion claims against Buck.

Shortly thereafter, the instant motions for summary judgment were filed. Troyer seeks summary judgment on its breach of contract claim only (Count I of the Second Amended Complaint). United, in turn, seeks summary judgment in its favor on all of Troyer's claims. Buck has filed a separate motion for summary judgment alleging that judgment should be entered in his favor on United's claim for contribution and/or indemnification because neither is available to United under the facts of this case. The motions are now fully briefed and ripe for adjudication.

DISCUSSION

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406 (7th Cir. 2009).

According to Rule 56:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do
> not establish the absence or presence of a
> genuine dispute, or that an adverse party
> cannot produce admissible evidence to
> support the fact.

Fed. R. Civ. P. 56(c). Furthermore, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it…" Fed. R. Civ. P. 56(e)(2),(3). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

Where a party bears the burden of proof on a particular issue, the party may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine dispute requiring a trial. *See Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 410 (7th Cir. 1988); *Hickey v. A.E. Stanley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an

essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.

Where the parties file cross-motions for summary judgment, the Court must consider each motion, but despite the parties' agreement that no genuine issue of material fact exists, the Court can deny all motions if the parties do not establish their rights to judgment as a matter of law. *Grabach v. Evans*, 196 F. Supp. 2d 746, 747 (N.D. Ind. 2002). Furthermore, the Court is permitted to consider materials in the record whether or not they are cited to by the parties. Fed. R. Civ. Pro. 56(c)(3).

Facts[1]

Troyer

Troyer is an Indiana company that distributes upholstery-based and other products to the RV Industry. From the mid-1980s until January 1, 2005, Darlene and Ron Clark owned Troyer. Ron Clark was described as honest, straightforward, and someone who kept his word. (Darlene Clark Dep. at 21 (DE 65-2)).

Buck began working for Troyer in 1987, while still in high school. (Buck Dep. at 13 (DE 63-2)). By 1992, Buck was the General Manager and Chief Operations Officer of Troyer (a position he held until he left the company in August of 2012).

_____
[1] Because the facts in this case are largely undisputed, albeit not their legal significance, the Court will provide citations only where directly quoting the evidence or where the parties dispute the facts.

(*Id.* at 19, 51 (DE 65-3)). The same year that Buck was promoted, Clark gave Buck two shares of the company and invited him to join the Board of Directors ("Board"). (*Id.* at 19).

In the mid-1990's, Troyer implemented an IRA program for its employees. Clark contacted Daniel Holtz ("Holtz"), a licensed securities dealer, to set up the program. In 1998, Clark asked Holtz to join Troyer's Board.

## Buck and Clark applied for a life insurance policy through United.

On September 16, 2002, Clark and Buck applied for a life insurance policy with United. The application identified Clark as the insured, and Buck as the proposed owner and beneficiary of the policy.

Holtz, who at the time was only a Troyer Board member, was not involved in applying for the life insurance policy. Buck and Clark never discussed the policy with Holtz when they were completing the application.

## The beneficiary of the policy was changed to Troyer.

Ultimately, the policy was issued with Troyer as the beneficiary. There are two competing versions of how this came to be. According to Troyer, United's underwriting department would not allow Buck to be the beneficiary of the policy. So, on February 5, 2003, United's underwriters "approved" the policy

and noted, "amend owner as Troyer Products ... amend benef as Troyer Products." (Tylkowski Dep. at 61-62, 87 & Ex. 30 (DE 60-6)). According to United, due to tax concerns, Clark and Buck decided to amend the policy so that Troyer was the designated beneficiary. (Buck Dep. at 40 (DE 65-3)). For purposes of the instant motions, the reason for the change is not material.

On February 12, 2003, United sent Troyer the "policy output" packet which is "information that goes out in regard to the issuance of coverage." (Tylkowski Dep. at 64 & Ex. 28 (DE 60-6)). United included in this packet an amendment intended to change the owner and beneficiary of the policy to Troyer and asked Troyer to have the amendment "signed by the Applicant and returned to United of Omaha." *Id.*

On February 17, 2003, Clark and Buck signed the amendment. The amendment changed the beneficiary of the policy from Dave Buck to Troyer Products.

<u>United issued the policy with Troyer as owner and beneficiary</u>.

United issued Policy No. BU1096496 (the "policy") with the owner and beneficiary as Troyer, effective February 12, 2003. The policy's expiration date was February 12, 2039. The parties agree that the policy is a valid and enforceable contract.

Under the policy, United was required to pay Troyer $1,000,000 if Clark passed away before the expiration of the

8

policy and no exclusions to coverage applied. If United failed to pay Troyer the death benefit within 30 days of the date United received proof of Clark's death, United agreed to pay interest on the proceeds at a "guaranteed rate of interest" of three percent from the date of death to the date of payment. (Policy at 9, 13 (DE 53-2)).

<u>United "coded" the amendment as a Post Issue Requirement ("PIR") in the image folder</u>.

The policy has an electronically-stored image folder that contains every document related to the policy. The policy's image folder contains a table of contents that identifies each document in the folder by name and number. If a United employee needs to access a particular document, they would click on the document link and an image of the document would appear on their computer screen.

United has a facility in Blair, Nebraska "where the incoming mail comes in [and] gets scanned and coded into [United's] computer system." (Tylkowski Dep. at 32 (DE 60-6)). "[E]very time a piece of mail comes in or a document comes in with respect to a policy" the employees in United's Blair facility "are responsible for scanning it into the image folder, sending it into the image folder, and then updating the image folder to make sure ... the document is coded properly." (*Id.* at 32.)

On March 11, 2003, United scanned the signed amendment into the Policy's image folder and improperly coded the amendment as a Post-Issue Requirement or "PIR," instead of a beneficiary change.

<u>The Clarks sold the company to Holtz and Buck</u>.

The Clarks decided they wanted to retire. They wanted to sell the company to Buck, but Buck could not afford it. Ultimately, on January 1, 2005, the Clarks sold all of their Troyer shares to Holtz and Buck. This was effectuated through a leveraged buyout of the Clarks' shares through a Stock Purchase Agreement ("SPA"). Under the SPA, the Clarks loaned $1.75 million to Holtz and Buck to purchase their shares. In return, Holtz and Buck executed promissory notes that would repay the Clarks over time from income they would earn as Troyer shareholders.

Holtz became Troyer's president and Buck continued in his role as General Manager and Chief Operating Officer. Since January 1, 2005, Holtz has owned 61% and Buck has owned the remaining 39% of Troyer.

Buck had considerably more experience at Troyer than Holtz, but Holtz indicated he felt he was "in a better position to know how to do things" than Buck. (Holtz Dep. at 70 (DE 65-1)). Buck wanted to run things much as Clark had. (*Id.* at 49). This

led to tension between the two. Nonetheless, Troyer continued to perform well.

## United told Troyer that Buck was the beneficiary of the policy.

On November 12, 2011, Clark passed away. Up until Clark's death, Troyer paid all premiums for the policy.

In November of 2011, after Clark died, Buck and Holtz discussed the policy. During this discussion, Buck told Holtz that Troyer was the beneficiary of the policy. This discussion prompted Holtz to call United to verify the policy's beneficiary.

When he called United on December 1, 2011, Holtz was the President and majority owner of Troyer and was acting on behalf of the Company. During the call, United employee Joyce McDaniel ("McDaniel") advised Holtz that Buck was the beneficiary of the policy. McDaniel either obtained that information from the policy's image folder or another system called "Epiphany."

During his call with McDaniel, Holtz had an unexecuted copy of the amendment[1] and asked McDaniel if United had an executed copy in the policy's file. McDaniel said no.

---

[1] It is not clear where this copy came from, but a copy of the amendment was attached to the SPA executed in 2005.

<u>United informed Troyer, in writing, that Buck was the
beneficiary and instructed Troyer to have Buck complete the
claim statement</u>.

Kevin Breeling is a life-claims specialist at United. On
December 2, 2011, Breeling reviewed the policy's image folder
and, like McDaniel, concluded that Buck was the beneficiary of
the policy. Breeling relied upon the policy's application
within the image folder to determine that Buck was the
beneficiary. Breeling reviewed only the application and did not
look at any other documents in the image folder because none of
them referenced a "beneficiary update" and that was Breeling's
"first concern." (Breeling Dep. at 68-69 (DE 60-1)). Breeling
did see a document labeled PIR in the image folder, but he did
not review that document because "[t]he PIR entries wouldn't
have anything to do with the beneficiary…if there was a change,
it should have been a beneficiary update." (*Id.* at 69). That
document labeled PIR was the amendment that made Troyer the
beneficiary of the policy.

On December 2, 2011, Breeling sent a letter to Troyer
enclosing a blank claim statement for the policy. Breeling
addressed the letter to Holtz because, based on United's system,
Holtz was the person who initiated the claim process. In his
letter, Breeling stated:

> [t]he beneficiary of the policy is Dave
> Buck. Please ask him to complete and sign
> the enclosed claim statement.

(*Id.* at 69-70 & Ex. 7). Breeling relied solely on the policy's application, and never spoke with anyone from Troyer before sending this letter.

Buck called United on December 12, 2011. At that time, he was unaware that Holtz had called United, but a United representative told him that Holtz had already called to report Clark's death. (Buck Dep. at 187-88 (DE 65-3)).

Holtz did not object to Buck completing the claim statement.

On Thursday, December 15, 2011, Troyer's Board of Directors met to discuss, among other things, the policy. At that time, there were three living Directors of Troyer – Holtz, Buck, and Darlene Clark – all of whom were present at the meeting. Buck was the only Board member at the meeting with personal knowledge of changing the beneficiary to Troyer. At the meeting, Buck believed that Troyer was the policy's beneficiary. (Buck Dep. at 192-93 (DE 60-5)). Holtz indicates he believed that Buck was the beneficiary because that is what United told him on December 1, 2011 – therefore, at the meeting, Holtz assumed that Buck "would be doing what he needed to [do] to get the money." (Holtz Dep. at 210-11, DE 60-3)). United, however, contends that Holtz knew Troyer was the beneficiary of the policy because he had discussed this with Buck. (Holtz Dep. at 296 (Doc 60-3)). Likewise, Troyer notes that Darlene Clark testified that

she thought Buck was the beneficiary, and she believed this was said at the meeting on December 15, 2011. (Clark Dep. at 174-75 (DE 60-4)). She admits her belief was based on an assumption and former discussions dating back to 2002. (*Id.*). But, despite her assertion that Buck was the beneficiary, the minutes which Clark endorsed show that the beneficiary had been changed to Troyer. (Clark Dep. at 86 (DE 65-2)).

At the conclusion of the Board meeting, and based upon United's representations on December 1, 2011, Holtz did not object to Buck executing a claim statement to redeem the policy's death benefit. The parties offer divergent views of what occurred at that Board meeting. According to Darlene Clark, Troyer determined that, regardless of who was the beneficiary, the money from the policy would go to Buck. (Clark Dep. at 220-21 (DE 65-2)). Darlene Clark testified that, in making this decision, Troyer did not rely on any information from United. (*Id.* at 121).

The meeting was recorded and both Darlene Clark and Dan Holtz took handwritten notes. After the meeting, Darlene Clark's notes and the audio recording were given to Jennifer Yoder ("Yoder"). Yoder was asked to type minutes of the meeting. She typed the minutes and attests that what she prepared accurately reflected the discussion at the meeting. (DE 65-17 ¶¶ 2-5). Those minutes state, in relevant part, that:

14

> Discussion of insurance proceeds for the
> term life insurance from United Omaha Life,
> Policy Number BU1096496 on the life of
> Ronald Clark, who passed away November 12,
> 2011. David discussed that in 2003 Dave and
> Ron took out this policy and on the hand
> written application listed David Buck as the
> beneficiary then it was changed to Troyer
> Products for tax purposes, with the
> understanding that the proceeds would go to
> David Buck for the purpose of buying Troyer
> Products. Board approved proceeding with
> filing the paperwork to redeem the monies
> with proceeds going to David Buck. It will
> be discussed with Stan Hess about how to
> disperse the monies legally.

(*Id.* at Ex. A).

Darlene Clark and Buck testified that these minutes are accurate. (Clark Dep. at 86 (DE 65-2); Buck Dep. at 81 (DE 65-3)). Holtz disputes this. According to Holtz, the policy was discussed at the Board meeting, but nobody at the meeting said that Troyer was the beneficiary:

> Q: Did Mr. Buck state that in 2003, Dave and
> Ron took out this policy, and on the
> handwritten application listed David Buck as
> the beneficiary and then it was changed to
> Troyer Products for tax purposes with the
> understanding that the proceeds would go to
> David Buck with the purpose of buying Troyer
> Products?
> A: That would not be my recollection.
> Q: What would your recollection be?
> A: That we discussed that he [Buck] was the
> beneficiary and I said – and that we
> discussed that we – that Ron – Dave and
> Darlene wanted to make sure that the
> proceeds were distributed properly and were
> going to talk to Mr. Hess.
> Q: Okay.

A: And I indicated that – I remember using the words, "I don't have a dog in this fight because he's the beneficiary."

A: Okay. Did the board approve proceeding with filing the paperwork to redeem the monies with the proceeds going to David Buck?

A: That's at odds with my recollection because I firmly recollect that we took no official board vote or action on the subject.

* * *

Q: And who said Dave Buck is the beneficiary of the policy?

A: I know that I did.

Q: Okay. You did. Did Mr. Buck say that?

A: I don't recall.

Q: Did Ms. Clark say that?

A: I don't recall.

Q: Okay. So you're telling – on behalf of the company what you're saying is, we discussed that Dave Buck was the beneficiary, but what you really mean is I discussed Dave Buck was the beneficiary because that's what Mutual of Omaha told me.

A: Un-huh.

Q: Which conflicted with the company's own knowledge based upon the documents in the file.

A: Okay.

Q: Is that your testimony to the jury?

A: My testimony is also that no one in that meeting said that the company is the beneficiary.

(Holtz Dep. at 174, 177-78 (DE 65-1)).


<u>Buck completed the claim statement</u>.

Buck first received Breeling's December 2, 2011, letter and blank claim statement on Friday, December 16, 2011, the day after the Troyer Board meeting. Before he read Breeling's letter, Buck understood that Troyer was the beneficiary of the

16

policy. When he read the letter on December 16, 2011, Buck was shocked or surprised that he was listed as the beneficiary because he understood that Troyer was the beneficiary. He knew that "Dave Buck and Troyer Products [were not] the same thing." (Buck Dep. at 204 (DE 60-5)).

After reading Breeling's letter, Buck never called United or asked United to check its records. Instead, Buck signed the claim form as the policy's beneficiary on December 16, 2011 – the same day he received Breeling's letter. The claim form instructed United to mail the policy benefits to 1090 Bloomingdale, Bristol, Indiana, 46507 – Troyer's business address at the time – and to make the proceeds payable to Buck. After signing his name on the claim statement as the policy's beneficiary, Buck never informed United that it had made a mistake. According to Buck, he "had no reason to call them." (*Id.* at 203-04).

## United told Troyer a third time that Buck was the policy's beneficiary.

Holtz called United again on December 19, 2011, to double-check about the policy's beneficiary. This time he spoke with United employee Jamie Hickman ("Hickman"). Holtz asked Hickman to verify the policy's beneficiary. Like McDaniel, Hickman advised Holtz that the policy's beneficiary was Buck. Holtz asked Hickman to check the policy file again, and specifically

17

asked her if United had an executed copy of the amendment in the file.   Like before, United told Holtz that it did not have the signed amendment and that Buck was the policy's beneficiary.

## United approved Buck's claim and paid Buck $1,000,000.

United received Buck's completed and signed claim form on December 20, 2011.   Buck completed and signed the claim form as the policy's beneficiary, just as Breeling had instructed in his December 2, 2011, letter.   On January 3, 2012, Breeling approved paying the $1,000,000 death benefit to Buck, and Breeling's supervisor, Nancy Nicholson, co-approved the claim.   From December 1, 2011, when United opened the claim, to January 3, 2012, when United approved and paid the claim to Buck, Breeling never spoke with Buck, Holtz, or anyone from Troyer; he had no knowledge of any discussions between Buck and Holtz regarding the policy; and he had no knowledge of the December 15, 2011, meeting – or any other meetings at Troyer – regarding the policy.[2]   Instead, Breeling relied only on the image folder, application, and completed claim statement before approving the claim and paying the $1,000,000 death benefit to Buck.   Breeling did not review or rely upon the improperly-coded amendment because, based on the way it was coded (PIR), Breeling assumed that the document did not relate to the policy's beneficiary.

---

[2] Nobody at United was aware of the December 15, 2011, Troyer Board meeting until after United approved and paid the claim to Buck.

On January 3, 2012, United sent Buck a letter approving the claim and a check for $1,000,000. United's approval letter made no mention of Troyer. United's $1,000,000 check was paid "TO THE ORDER OF DAVE BUCK" and made no mention of Troyer. In reality, when United paid the $1,000,000 death benefit to Buck, the beneficiary under the policy was actually Troyer, not Buck.

## Buck attempted to purchase Holtz' shares of Troyer and was removed from Troyer's Board shortly thereafter.

Buck received the $1,000,000 from United on January 9, 2012. He donated $100,000 to his church and used a portion of the money to pay a variety of personal expenses, including a debt owed to Darlene Clark as a result of a loan under the SPA. He and Darlene Clark also attempted to buy out Holtz' interest in Troyer. Buck, Darlene Clark, and Holtz met to discuss a possible buyout in late January 2012, but the discussions went nowhere. Following the attempted buyout, Holtz used his status as a majority shareholder to call a shareholder's meeting on February 6, 2012, and to kick Buck off the Board. (DE 65-21).

<u>Holtz revised the minutes of the December 15, 2011, meeting</u>.

Prior to April 3, 1012, Holtz revised the minutes of the December 15, 2011, meeting.[3]  As revised, the meeting minutes read in relevant part as follows:

> Discussion of company-owned life insurance policy on the life of Ron Clark; no action taken.

(DE 65-23). Holtz testified that he revised the minutes after a conversation with counsel.

On April 3, 2012, the next shareholder's meeting occurred. Holtz voted in a new Board.  That new Board met for the first time the same day and approved the revised minutes.  According to the minutes of that meeting, the approval was unanimous although Darlene Clark testified that she voted against approving the minutes because they were not truthful.

<u>Troyer asked for a complete copy of the policy and received only the application</u>.

On March 27, 2012, Holtz wrote United and asked for a complete copy of the policy's file in order to see "all documentation of changes in owner or beneficiary" of the policy. (Breeling Dep. at 88-89 & Ex. 15 (DE 60-1)).  On April 12, 2012, in response to Holtz's letter, Breeling sent Holtz only a copy of the policy's application.  Breeling neither looked for nor

---

[3] Holtz contends that these revisions were made in January of 2012.  (Holtz Dep. at 255).  United argues that documentation shows the revision was not made until April 2, 2012.  Ultimately, this is not a dispute that matters.

sent Holtz any other documents from the image folder because "[h]e's asking specifically about beneficiary" and there were "no coding changes that would indicate to [Breeling] that there was a beneficiary change done." (*Id.* at 91-92).

## United discovered that it "screwed up."

On May 2, 2012, Holtz called United again and asked for documentation showing a change of either ownership or beneficiary of the Policy. Breeling received notice of Holtz's request and, this time, Breeling went "back through the Image documents and look[ed] at everything in there." (*Id.* at 103). When he went back through the image folder, Breeling discovered the executed amendment coded as a PIR.

When Breeling discovered the executed amendment coded as a PIR, he was "surprised where [he] found the document" because it "was miscoded, and wasn't coded as it was supposed to be." (*Id.* at 107). Breeling was "upset because they didn't code [the amendment] properly." (*Id.* at 108). According to Breeling, the amendment "shouldn't have been a PIR; it should have been a beneficiary change." (*Id.* at 151). When asked whether someone at United "had screwed up," Breeling responded: "Pretty much." (*Id.* at 108).

Breeling met with his department a day or two after discovering that United had miscoded the amendment as a PIR and

informed them that he had "found some information that was in a miscoded item" and instructed his team to "watch out for potential miscodes" and "review the documents more thoroughly." (*Id.* at 108-10).

Troyer demanded payment and United refused.

On May 2, 2012, Breeling emailed a copy of the executed amendment to Holtz. On May 8, 2012, Troyer sent a letter to United demanding payment of the policy's $1,000,000 death benefit. Breeling first reviewed Troyer's demand letter on June 12, 2012, and the same day forwarded the letter to Susan Lewis ("Lewis"), one of United's in-house attorneys.

At 10:34 a.m. on June 13, 2012, Lewis sent the following email to Troyer's attorney, Cassidy Fritz ("Fritz"):

> Mr. Fritz, to follow-up on our telephone conversation earlier today, attached is the letter and claim forms that were sent to your client in December 2011. Your client knew that United of Omaha was going to pay the benefits to Mr. Buck and failed to raise any concerns. As I mentioned, United of Omaha is not going to send your client a check. Research has revealed that Dave Buck is an owner of Troyer. You mentioned he was a minority shareholder, but nonetheless, your client knew what was happening and should seek money from Mr. Buck. If necessary, United of Omaha will file a declaratory judgment action against Troyer, Buck and Holtz.
>
> Please let me know if you have any questions or would like to discuss further.

(Breeling Dep. at 124 & Ex. 26 (DE 60-1)).  After receiving

United's June 12, 2012, denial, Troyer commenced this

litigation.[4]  Shortly thereafter, Holtz asked Darlene Clark to

leave the Board.  The Board also restructured Holtz' pay so that

his salary increased significantly and was no longer tied to the

corporation's performance.  At the same time, Troyer stopped

making distributions to its shareholders, including Buck.


A dispute of fact regarding waiver precludes summary judgment
for either Troyer or United on Troyer's breach of contract
claim.

To prevail on its breach of contract claim against United,

Troyer must prove that a contract exists, that United breached

that contract, and that it suffered damages.  *See Rogier v. Am.*

*Testing & Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000).

The parties do not dispute that a binding contract exists, but

they disagree regarding whether a breach occurred.

It is clear that the beneficiary was Troyer, but the

proceeds were paid to Buck.  However, United argues that,

because Buck was an Officer and Director of Troyer at the time

United made payment to him, United fulfilled its obligation of

paying the money to Troyer.  In other words, United asserts that

it simply did what Troyer told it to do.  Unfortunately for

United, it has not bothered to support this argument with any

---

[4] United notes that the decision to commence litigation was made by Holtz
without Board approval and in violation of the corporate bylaws.  This is not
material to the outcome of the instant motions.

citation to legal authority.  This Court will not make United's arguments for it.  *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999)("It is not the responsibility of this court to make arguments for the parties.").

Additionally, for United to prevail on its argument, this Court must ignore other relevant undisputed facts: United had told Holtz that Buck was the beneficiary, and it was United that told Troyer, in writing, to have Buck complete the beneficiary form.  These facts at least suggest that United did not just "do what they were told to do" by Troyer; perhaps it was Troyer who simply did what it was told by United.

United also argues that Troyer suffered no damages, citing to testimony from Darlene Clark and Buck indicating that they do not believe Troyer suffered damages.  This argument would make sense if United had fulfilled its obligation under the contract to pay the insurance proceeds to Troyer, but United failed to support that argument with any legal authority.  As a result, its argument on damages also fails:  if Troyer should have received $1,000,000 that it did not receive, then clearly the company suffered damages.

Additionally, United argues that Troyer waived its right to obtain the insurance proceeds at the December 15, 2011, Board meeting.  According to United, the original Board meeting minutes demonstrate a waiver.  With regard to waiver, United's

argument is more convincing. The Indiana Supreme Court has noted the following regarding waiver in *Tate v. Secure Ins.*:

> Technically, there is a distinction between "waiver" and "estoppel." A waiver is an intentional relinquishment of a known right and is a voluntary act, while the elements of estoppel are the misleading of a party entitled to rely on the acts or statements in question and a consequent change of position to his detriment. But in the law of insurance, the distinction between "estoppel" and "implied waiver" is not easy to preserve, and, quite commonly, in insurance cases, the courts have found it unnecessary or inadvisable to make a distinction between them and have used the terms interchangeable.

587 N.E.2d 665, 671 (Ind. 1992); *see also Welty Bldg. Co., Ltd. v. Indy Fedreau Co., LLC,* 985 N.E.2d 792, 798 (Ind. Ct. App. 2013); *Westfield Nat. Ins. Co. v. Nakoa,* 963 N.E.2d 1126, 1132 (Ind. Ct. App. 2012). For an insurer to have waived coverage, an insurer must have "knowledge of facts which would have permitted it to deny coverage." *Ill. Founders Ins. Co. v. Horace Mann Ins. Co.*, 738 N.E.2d 705, 707 (Ind. Ct. App. 2000). Waiver also requires a "distinct act of affirmance." *See Am. Family Mut. Ins. Co. v. Kivela*, 408 N.E.2d 805, 811 (Ind. Ct. App. 1980). But this case, while it does involve insurance, does not involve an insurer who allegedly waived a defense to coverage – it involves an insured who allegedly waived the right to receive insurance proceeds.

In response to United's waiver argument, Troyer argues that United lacked knowledge of the Board meeting when it paid the proceeds to Buck, and therefore could not have relied upon the Board's decision when it decided to pay insurance proceeds to Buck. Troyer's argument assumes that detrimental reliance is required for waiver.[5] An explicit waiver, however, unlike an implied waiver or estoppel, does not require detrimental reliance: it requires knowledge of the existence of the right and the intent to relinquish it. *See Westfield*, 963 N.E.2d at 1132.

Both Troyer and United have sought summary judgment on this claim. United asserts that Troyer unquestionably intended to relinquish its rights at the December 15, 2011, meeting. But United, in so asserting, asks this Court to close its eyes to Holtz' assertions that no action was taken at the December 15, 2011, meeting. In short, United invites this Court to weigh the evidence and determine that the accounts of Darlene Clark and Buck (who both affirm the original meeting minutes are accurate) are more believable than the account of Holtz (who disputes the accuracy of the original meeting minutes in several material respects). Similarly, Troyer, in asking for summary judgment on

---

[5] An earlier order by this Court addressed estoppel in the context of a motion to dismiss, noting that United's own negligence might prevent it from relying on estoppel, but this Court is now addressing waiver, not estoppel, and in the context of this case, those concepts are not one in the same. (See DE 44 at 13; *Tate*, 587 N.E.2d 671).

this claim, asks this Court to endorse its version of the facts.[6] This Court cannot and will not weigh the evidence on summary judgment. Because there is a dispute regarding what occurred at the Board meeting on December 15, 2011, this matter is not appropriate for summary judgment.

<u>Troyer's Negligent Misrepresentation Claim</u>

United argues that Troyer's negligent misrepresentation claim should be dismissed on summary judgment for two reasons: (1) Indiana would not recognize the tort in the context of this case; and (2) Troyer cannot show justifiable reliance. The first argument is dispositive, and the Court therefore will not address justifiable reliance.

This Court raised the issue of whether the tort of negligent misrepresentation was available to Troyer in response to an earlier motion to dismiss, noting in a footnote that:

> The Court has some uncertainty as to whether negligent misrepresentation is a viable cause of action under the facts of the present case. Under Indiana law, negligent misrepresentation is a limited cause of action that is only available in certain

---

[6] Troyer argues that no reasonable juror could find that Troyer intentionally relinquished a known right to recover the death benefit. According to Troyer, this would require that United prove Troyer knew that it was the policy beneficiary before it allowed Buck to submit the claim form. Troyer believes this cannot be proven. Troyer's argument assumes the truth of its version of the facts, but there is a dispute regarding what happened at the Board meeting on December 15, 2011, and if the version memorialized in the original meeting minutes was accepted by the jury, then a reasonable jury could find that Troyer had knowledge that they were the beneficiary of the policy prior to the claim form being submitted. Accordingly, this argument must fail.

> circumstances. *See Mart v. Forest River,*
> *Inc.*, 854 F. Supp. 2d 577, 595 n. 18 (N.D.
> Ind. 2012); *U.S. Bank, N.A. v. Integrity*
> *Land Title Corp.,* 929 N.E.2d 742, 747 (Ind.
> 2010); *Westfield Ins. Co. v. Yaste, Zent &*
> *Rye Agency*, 806 N.E.2d 25, 30 n. 4 (Ind. Ct.
> App. 2004) (*citing Darst v. Illinois Farmers*
> *Ins. Co.*, 716 N.E.2d 579, 584 (Ind. Ct. App.
> 1999)); *Jim Barna Log Sys. Midwest, Inc. v.*
> *General Cas. Ins. Co. of Wisconsin,* 791
> N.E.2d 816, 830 (Ind. Ct. App. 2003).
> Nonetheless, United does not raise this
> argument, and this Court will not make the
> parties arguments for them. *Vaughn v. King,*
> 167 F.3d 347, 354 (7th Cir. 1999)("It is not
> the responsibility of this court to make
> arguments for the parties.").

(DE 44 at 8).

Indiana generally follows the economic loss rule. *See*
*U.S. Bank N.A. v. Integrity Lane Title Corp.*, 929 N.E.2d 742
(Ind. 2010). Under this rule, "a defendant is not liable under
a tort theory for any purely economic loss caused by its
negligence[.]" *Id.* (citing *Indianapolis-Marion Cnty. Pub.*
*Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 726-27
(Ind. 2010)). There are, however, certain limited exceptions.
*Id.* One of those exceptions is the tort of negligent
misrepresentation.

Indiana has adopted the definition of "negligent
misrepresentation" contained in the Restatement (Second) of
Torts § 552(1), which provides that:

> One who, in the course of his business,
> profession or employment, or in any other
> transaction in which he has a pecuniary

> interest, supplies false information for the
> guidance of others in their business
> transactions, is subject to liability for
> pecuniary loss caused to them by their
> justifiable reliance upon the information,
> if he fails to exercise reasonable care or
> competence in obtaining or communicating the
> information.

*Integrity*, 929 N.E.2d at 747. Indiana recognized the tort of negligent misrepresentation in the context of employer-employee relations in *Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623, 628-29 (Ind. Ct. App. 1983). In *Eby*, the plaintiff alleged that he had been promised a job, but when he relocated, he learned that the job was not available. *Id*. at 625.

Following the *Eby* decision, the Seventh Circuit described the state of Indiana law regarding negligent misrepresentation as "one of 'relative chaos.'" *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 721 (7th Cir. 1994). The Court in *Trytko* noted that, since *Eby,* Indiana's appellate courts have declined to recognize the tort outside the employment context. *Id.* at 720.

Then, in 2010, the Indiana Supreme Court carved out another exception – it allowed a claim of negligent misrepresentation by a lender who relied upon a title search by a title insurance company. *Integrity*, 929 N.E.2d at 749. In reaching this conclusion, the Court in *Integrity* considered the following comment regarding the tort of negligent misrepresentation as codified in the Restatement (Third):

> An actor may undertake a duty when it
> supplies specific information in response to
> a specific request that makes it clear the
> recipient intends to attach significant
> importance to the information in making a
> decision that exposes the recipient to a
> risk of loss if the information is
> inaccurate.

*Id.* (citing *Restatement (Third) of Economic Torts and Related Wrongs* § 9, Cmt. F (Council Draft No. 2, 2007)).

The Indiana Supreme Court's ruling in *Integrity* did not completely eliminate the state of relative chaos described in *Trytko*, but it did somewhat clarify the scope of negligent misrepresentation claims in Indiana. In *Integrity*, it was the lender who brought the claim for negligent misrepresentation, and the Indiana Supreme Court specifically noted that the insurance company could be liable to the lender under the tort theory of negligent misrepresentation "*if the title company and the lender did not have a contractual relationship.*" *Izynski v. Chicago Title Ins. Co.*, 963 N.E.2d 592, 597 (Ind. Ct. App. 2012)(describing the Court's holding in *Integrity*). The Indiana Supreme Court noted that Integrity had denied privity at every stage. *Integrity,* 929 N.E.2d at 745. According to the Court, this point was critical: "[w]ere there to be a contract between Integrity and U.S. Bank, the parties in all likelihood would be relegated to their contractual remedies." *Id.* (*citing Indianapolis-Marion Cnty. Pub. Library*, 902 N.E.2d at 729). The

Court only considered the tort claim after it had determined that there was not privity between the parties. If this was not clear enough, later, in a footnote, the Court again noted that it does not "adopt the proposition that a tort claim for negligent misrepresentation may be brought where the parties are in contractual privity." *Integrity,* 929 N.E.2d at 749; *see also Izynski*, 963 N.E.2d at 597.

Troyer asserts in one of its briefs that it is in privity with United.[7] (DE 70 at 12, n. 44). Based on this concession, it would appear at first glance that *Integrity* would direct that summary judgment be granted in United's favor. However, despite Troyer's assertion of privity, the Court cannot ignore the capacity in which Troyer brings the claim: this suit is about life insurance proceeds, and Troyer's alleged damages do not flow from its status as owner of the policy but its status as beneficiary. Accordingly, while Troyer is in privity of contract with United, under the facts of this case, it is not clear that the insistence on a lack of privity in *Integrity* would bar this claim.

This Court must, therefore, consider whether, based on *Integrity*, it is likely that Indiana would recognize the tort of negligent misrepresentation under the facts of this case. In

---

[7] Troyer relies on its asserted contractual privity to support its argument that its bad faith claim is permissible.

other words, is the difference between title insurance and life insurance such that the concepts adopted by the Indiana Supreme Court in *Integrity* are transferable to this context?

Troyer notes that, in *Integrity*, the Court relied upon the fact that title commitments are normally relied upon by insureds, that there was an advisory relationship between the commitment issuer and the plaintiff, that the issuer had superior knowledge and was in the business of providing such knowledge, and that the information was provided in response to a specific request and designed to guide the plaintiff in making a decision. *See Integrity*, 929 N.E.2d at 748-49. Certainly, some of these same factors are present here. But *Integrity* also relied upon prior Indiana cases that showed a willingness in the title insurance industry to go beyond the terms of the insurance contract and explore the existence of a duty in tort. *Id*. at 748 (citing *Altman v. Circle City Glass Corp*., 484 N.E.2d 1296, 1300 (Ind. Ct. App. 1985) and *Lawyers Title Ins. Corp. v. Capp*, 174 Ind. App. 633, 637 n.1, 369 N.E.2d 672, 674 n.1 (1977)). While Troyer's argument that *Integrity* would allow for the tort of negligent representation under the facts of this case is certainly not frivolous, it does represent an expansion of the tort as currently recognized in Indiana. It is not this Court's role to expand upon the availability of tort remedies that Indiana has made clear are to be very limited in scope. In

solidarity with other judges of this Court, "a more expansive view of the tort than that adopted to date in Indiana" will not be adopted here. *Mart v. Forest River*, *Inc.*, 854 F. Supp. 2d 577, 598 (N.D. Ind. 2012) (quoting *Trytko*, 28 F.3d at 721, quoting in turn *Indus. Dredging & Eng'g v. S. Ind. Gas & Elec. Co.*, 840 F.2d 523, 526 (7th Cir. 1988)). Accordingly, summary judgment will be granted in United's favor on Troyer's negligent misrepresentation claim.

## Troyer's Bad Faith Claim

Insurers have a duty to deal in good faith with their insured. *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 518-19 (Ind. 1993). A plaintiff can demonstrate bad faith by showing that "the insurer had knowledge that there was no legitimate basis for denying liability." *Friedline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002). "As a general proposition, '[a] finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill-will." *Monroe Guar. Ins. Co. v. Magwerks Corp.,* 829 N.E.2d 968, 977 (Ind. 2005)(quoting *Colley v. Ind. Farmers Mut. Ins. Group,* 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998)). Mere negligence is insufficient to support a claim of bad faith. *Erie,* 622 N.E.2d at 520. But, "an insurer which

denies liability knowing that there is no rational, principled basis for doing so has breached its duty." *Id.*

In Indiana, third-party beneficiaries cannot sue an insurer in tort for bad faith. *See Cain v. Griffin*, 849 N.E.2d 507, 515 (Ind. 2006). In *Cain*, the plaintiff slipped and fell in a restaurant parking lot. That restaurant had an insurance policy covering claims for injuries like those alleged by the plaintiff. The plaintiff claimed that the restaurant's insurer acted with bad faith toward her. The Court noted that the obligation in tort to act in good faith arises not just from the contractual relationship between the insurer and insured, but from the "special relationship" that exists between them. *Id.* at 510. The Court in *Cain* held "that a third-party beneficiary may sue the insurer directly to enforce the contract between the insurer and the insured...[b]ut [the court did] not find…that a third-party beneficiary and the insurer [had] the 'special relationship' described in *Erie* that would impose on the insurer a duty under tort law to deal with the third party in good faith." *Id.* at 514-15. Accordingly, the injured plaintiff could not bring a bad faith claim in tort against the restaurant's insurer. *Id.*

One year after the *Cain* decision, this Court questioned whether the *Cain* holding applied to the facts of the *Eberle* case. *Eberle v. Prudential Ins. Co.,* 2007 WL 541821, at *10.

(N.D.Ind. Feb. 14, 2007).  The Court noted that, based on the facts of the case, "Eberle seems to be more than a third party beneficiary."  *Id.*  However, that statement was ultimately dicta: this Court dismissed the bad faith claim because there was not sufficient evidence of bad faith to survive summary judgment.  *Id.*

In 2006, the Indiana Court of Appeals, in an unpublished case, addressed *Cain* in the context of a claim of bad faith by a beneficiary of a life insurance contract.  *Blesch v. American General Life Ins.*, No. 82A05-0512-CV-701, 2006 WL 3593491, at *2 (Ind. Ct. App. Dec. 12, 2006).  In *Blesch*, the Court noted that the Indiana Supreme Court had "recently addressed the status of beneficiaries under insurance policies in *Cain*…" and concluded that "they were not in a fiduciary relationship so that the third-party beneficiary might sue in tort for breach of fiduciary duty."  *Id.*  Thus, Indiana courts have applied the *Cain* holding to a situation factually similar to the one before this Court.

The issue was addressed more recently by the Indiana Court of Appeals in another unpublished opinion.  *Cashner v. Western-Southern Life Assurance Co.*, No. 64A04-1311-PL-555, 2014 WL 2918272 (Ind. Ct. App. June 25, 2014).[8]  Cynthia Cashner, who had

---

[8] The *Cashner* opinion was issued after the parties filed their briefs in this case.

a life insurance policy with Western-Southern, was murdered by her husband. Her husband was the Class I beneficiary of the policy, and Cashner's parents were the class II beneficiaries of the policy. Because Cashner was murdered by her husband, he was disqualified from receiving the insurance proceeds and a dispute arose between Cashner's estate and her parents (the Class II beneficiaries) regarding who should get the life insurance proceeds. Ultimately, Cashner's parents brought a bad faith claim against Western-Southern. The bad faith claim was dismissed and Western Southern was awarded costs and attorney's fees. Cashner's parents appealed the order granting costs and attorney's fees. The Court of Appeals held that, in awarding attorney's fees, the trial court implicitly found that Cashner's parents' bad faith claim was frivolous. On appeal, Cashner's parents argued that their position was not frivolous, citing to the dissent in *Cain* and this Court's decision in *Eberle.* Like *Troyer,* Cashner's parents attempted to distinguish the facts of their case from *Cain*, noting that they were more than third-party beneficiaries. *Id.* at *3. The Indiana Court of Appeals correctly called this Court's commentary in *Eberle* dicta, noted that even if it were not dicta it would not be binding upon it, and found that there was no valid legal basis under Indiana law for Cashner's parents' bad faith claim. *Id.* at *4. The award of attorney's fees was affirmed. *Id.*

Although both *Blesch* and *Cashner* were unpublished opinions, these cases, taken together, show unwillingness on the part of Indiana Courts to make exceptions to the Indiana Supreme Court's holding in *Cain*. Troyer, like Eberle and Cashner's parents, has argued that it is more than a third-party beneficiary. And, perhaps, its argument is more persuasive than that of either Eberle or Cahsner: although not an insured, as owner of the policy, Troyer is in privity of contract with United. But privity alone has never been enough in Indiana to substantiate the type of special relationship needed to impose a tort duty to act in good faith. *Cain*, 849 N.E.2d at 510. And, Troyer's bad faith claim does not arise from its status as owner of the policy; it arises from Troyer's status as beneficiary of the policy. Troyer has pointed to no legal authority that would demonstrate it is entitled to bring a bad faith claim against United.[9] This Court can find no meaningful distinction between Troyer's bad faith claim and the type of bad faith claim

---

[9] The Court notes that Troyer's reliance on *Rex Ins. Co. v. Baldwin*, 323 N.E.2d 270 (Ind. App. 1975), as precedent for allowing a bad-faith judgment with punitive damages is wholly unfounded. The *Rex* case was not based on a tort theory of liability at all – it was based on breach of contract, at a time when Indiana allowed punitive damages in breach of contract cases. *Id.* *Rex* was decided in 1975; since then, Indiana's law has changed such that Indiana does not allow punitive damages to be recovered in breach of contract actions. *See Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608 N.E.2d 975 (Ind. 1993)("We hold that in order to recover punitive damages in a lawsuit founded upon a breach of contract, the plaintiff must plead and prove the existence of an independent tort of the kind for which Indiana law recognizes that punitive damages may be awarded.").

prohibited by the Indiana Supreme Court in *Cain.* Accordingly, summary judgment will be granted on Troyer's bad faith claim.

<u>United's claim for Indemnification or Contribution from Buck</u>

Count I of United's Third-Party Complaint alleges contribution and/or indemnification against Buck. Buck has requested that this Court enter judgment in his favor on United's claim seeking contribution and/or indemnification. United argues that the Court should delay ruling on this claim until it is found that United is liable to Troyer. Indeed, if United has no liability to Troyer, United's claim for contribution or indemnification against Buck would be moot. While this Court is tempted to follow this course, ultimately, because Buck has argued that United's claims against him are legally deficient, the issue is ripe for ruling and a delay in ruling is unfounded. Summary judgment exists for this reason – to weed out unmeritorious claims without forcing a litigant to endure the hardship of further litigation.

The facts presented in Buck's motion for summary judgment largely parrot the facts presented earlier in the context of Troyer's motion for summary judgment. Ultimately, Buck's motion for summary judgment turns not on any disputed facts but the law, so the Court will not spend time sifting through minor

discrepancies between Buck's summary judgment motion and the facts as set out above.

<u>Contribution</u>

Buck argues that United's claim for contribution must fail on summary judgment because Indiana has abolished common law contribution, and even before the abolishment, it only applied to joint tortfeasors. Additionally, Buck argues that the complaint makes clear that United is really seeking indemnification rather than contribution.

Contribution is defined as follows in Black's Law Dictionary:

1. The right that gives one of several persons who are liable on a common debt the ability to recover ratably from each of the others when that one person discharges the debt for the benefit of all; the right to demand that another who is jointly responsible for a third party's injury supply part of what is required to compensate the third party. – Also termed *right of contribution*.

2. A tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault.

3. The actual payment by a joint tortfeasor of a proportionate share of what is due.

Black's Law Dictionary 329 (7th ed. 1999).

Contribution involves the partial reimbursement of one who has discharged a common liability. *Mullen v. Cogdell,* 643 N.E.2d 400 (Ind. Ct. App. 1994). Indemnity, on the other hand, requires full reimbursement of the common liability. *Id.* A

review of the Third-Party Complaint makes clear that United is seeking full reimbursement, not partial:

> To the extent that Buck improperly received any of the proceeds from the death benefit paid by United of Omaha under the Policy, Buck owes a duty to United of Omaha for contribution and indemnity for all amounts incurred by United of Omaha as a result of Buck's wrongdoing.

(DE 14 at ¶ 23). United did not respond to Buck's argument that, in actuality, what United seeks is full indemnification – not partial contribution. Because Buck's argument is well-founded and United has offered no response, this Court finds that the relief requested in the Third-Party Complaint, despite the label, is more appropriately categorized as indemnification rather than contribution.[10]

---

[10] Buck also argues that United's contribution claim must fail because it has been abolished in Indiana, but that argument is less persuasive. In tort cases, contribution has been abolished in Indiana:

> In an action under this chapter…there is no right of contribution among tortfeasors. However, this section does not affect any rights of indemnity.

Ind. Code. § 34-51-2-12. But, the status of contribution in Indiana actions arising under contract law rather than tort law is unclear. At least one case has found that, because fault is not an issue in breach of contract or breach of warranty claims, cross-claims for breach of contract and warranty were not barred by the ban on contribution set forth in I.C. § 34-51-2-12. *See Elanco Animal Health v. Archer Daniels Midland Co.*, 1:08cv386-RLY-TAB, 2008 WL 4371339, at *3 (S.D. Ind. Sept. 18, 2008). *Elanco*, however, did not involve a stand-alone claim for contribution. Furthermore, the case is not binding on this Court. Nonetheless, this issue need not be decided because the plain language of the Third-Party Complaint makes clear that United is seeking not partial but full reimbursement, and thus the claim is more properly treated as a claim for indemnification.

<u>Indemnification</u>

According to Buck, indemnification is not available to United because: (1) United is not without fault; (2) United's liability to Troyer is not derivative or constructive; and (3) Buck has committed no wrongful act.

The Indiana Supreme Court summarized Indiana's law regarding indemnification in *Rotec v. Murray* as follows:

> Generally, the right of indemnification arises only by contract, express or implied, or by statutory obligation. However, a right to indemnity may be implied at common law. In the absence of any express contractual or statutory obligation to indemnify, such action will lie only where a party seeking indemnity is without actual fault but has been compelled to pay damages due to the wrongful conduct of another for which he is constructively liable.

*Rotec v. Murray Equip., Inc.*, 626 N.E.2d 533 (Ind. Ct. App. 1994)(citations omitted). In addition, indemnification is only available to "one whose liability to another is solely derivative or constructive and only against one whose wrongful act has caused such liability to be imposed." *Mullen v. Cogdell*, 643 N.E.2d 390, 400 (Ind. Ct. App. 1994).

If liable to Troyer, that liability will be neither derivative nor constructive. Derivative liability is liability for a wrong that a person other than the one wronged has a right to redress. *See* Black's Law Dictionary 925-26 (7th ed. 1999). Here, Troyer seeks a judgment on its own behalf – there is no

other person or entity who is seeking a judgment on behalf of another injured party. All of Troyer's claims against United are based on direct liability: that United breached its contract, that United made a negligent representation, and that United breached the duty of good faith and fair dealing.[11] In other words, each claim is based on United's acts, not Buck's. Troyer is not seeking liability based on any wrongful act of Buck.

Again, United made no argument that Troyer's claims against it were derivative or constructive. If United is liable to Troyer, United hints that it is because the fact-finder did not believe Buck's version of events surrounding the December 15, 2011, Board meeting. And, according to United, if the events of that Board meeting were not as Buck says they were, then Buck did engage in wrongdoing; namely, Buck engaged in insurance fraud. But, if United wanted to make a claim against Buck for insurance fraud, they could have done so. They did not, and the fact that Buck could be liable to United on a claim that United has not asserted is not enough to support indemnification in Indiana. In other words, while perhaps Buck should not get $1,000,000 free and clear if he engaged in wrongdoing, United

---

[11] Because Troyer's claims of negligent misrepresentation and bad faith fail on summary judgment, they could be completely disregarded here. Nonetheless, the Court has considered them to demonstrate that the result of Buck's summary judgment motion would not be altered if the claims of negligent misrepresentation and bad faith had survived summary judgment.

cannot short-circuit the litigation process by seeking indemnification without making its direct legal claim against Buck. Buck is not liable to Troyer for breach of contract, negligent misrepresentation, or bad faith, and he therefore cannot be forced to indemnify United on those claims.

Similarly, United suggests that, if a fact-finder rejects Buck's version of events at the December 15, 2011, Board meeting, then Buck may be liable to Troyer for breach of his fiduciary duties to the corporation. Again, Troyer has not sued Buck for breach of fiduciary duties. But, even if it had, if United is found liable on the current claims Troyer has lodged against it, that liability is due to United's own acts - breach of contract, negligent misrepresentation, or bad faith – not due to any breach of fiduciary duty by Buck.

Accordingly, indemnification is not available to United. Whether other remedies exist is for United's attorneys to determine.

Superseding / Intervening Cause.

In its response to Buck's motion for summary judgment, United argues for the first time that Buck "is a superseding or intervening cause of Troyer's damages, and he should be held liable to Troyer in tort." (DE 73 at 8). United asks this Court to "look beyond the formal names of causes of action and construe the allegations as appropriate." (*Id.*). According to

United, their claim for contribution or indemnification is really a claim that Buck should be held accountable for Troyer's damages as a superseding or intervening cause. (*Id.*).

The doctrine of superseding or intervening cause was described by the Indiana Supreme Court in *Control Techniques, Inc. v. Johnson*:

> The doctrine of superseding or intervening causation has long been part of Indiana common law. It provides that when a negligent act or omission is followed by a subsequent negligent act or omission so removed in time that it breaks the chain of causation, the original wrongdoer is relieved of liability. A subsequent act is "superseding" when the harm resulting from the original negligent act "could not have reasonably been foreseen by the original negligent actor." Whether the resulting harm is "foreseeable" such that liability may be imposed on the original wrongdoer is a question of fact for a jury.

*Control Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 107 (Ind. 2002)(citations omitted).

United's argument is problematic for two reasons. First, the issue is being raised by United for the first time in response to summary judgment. *See Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996)("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."); *Howard v. Ealing*, 876 F.Supp.2d 1056, 1072 (N.D. Ind. 2012). Secondly, the theory United relies upon is an affirmative defense to liability, not a separate

cause of action. *See Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1127 (7th Cir. 1999); *Fed. Deposit Ins. Co. v. Mahajan*, 923 F.Supp.2d 1133, 1141 (N.D. Ill. 2013). Accordingly, this Court declines United's invitation to treat its claim for contribution or indemnification as a claim based on Buck being a superseding or intervening cause. If such a cause of action exists (and that is doubtful), United will need to follow the normal procedure for amending its complaint or file a separate cause of action based on this theory.

For all of these reasons, Buck's motion for summary judgment is granted as to Count I of United's Third-Party Complaint.

## United's Claim for Prejudgment Attachment

Count IV of United's Third-Party Complaint against Buck alleges Prejudgment Attachment. Buck argues in his summary judgment motion that this count is moot. Indeed, a motion for prejudgment writ of attachment was filed early in the litigation and later withdrawn by agreement of the parties. Although no party ever moved to dismiss Count IV of the Third-Party Complaint, United's response to the summary judgment motion expressed no disagreement with Buck's suggestion that the count is moot. Accordingly, Count IV of the Third-Party Complaint is **DISMISSED AS MOOT.**

CONCLUSION

For the foregoing reasons, Troyer Products' request for oral argument (DE 72) is **DENIED;** Troyer Products' Motion for Partial Summary Judgment (DE 60) is **DENIED;** United of Omaha Life Insurance Company's Motion for Partial Summary Judgment (DE 65) is **DENIED** as to Count I (breach of contract) and **GRANTED** as to Counts II (negligent misrepresentation) and III (bad faith); and David A. Buck's motion for summary judgment (DE 63) is **GRANTED.** The Clerk is directed to enter judgment in favor of Buck on Counts I and IV of the Third-Party Complaint. This case shall remain pending as to Count I of the Second Amended Complaint only (the breach of contract claim).

DATED: September 29, 2014        /s/RUDY LOZANO, Judge
                                 United State District Court